DONALD KLINE *VS.* SHEARWATER ASSOCIATION, INC.,
& others.[1]

No. 04-P-89.

Barnstable. January 6, 2005. - July 11, 2005.

Present: ARMSTRONG, C.J., CYPHER, & KANTROWITZ, JJ.

*Subdivision Control,* Approval of plan, Conditions. *Real Property,* Covenant
running with the land.

In a civil action brought by a subdivision plot owner against the defendant
owners association after its rejection of the plaintiff's proposed house on
the basis of certain restrictive covenants applicable to the development, the
trial judge properly determined that the restrictive covenants were valid
and enforceable, as they were of actual and substantial benefit to the owner
association's members, and none of the five exceptions delineated in G. L.
c. 184, § 30, prevented the application of the restrictive covenants to the
plaintiff's proposal [830-834]; further, the trial judge's conclusion that the
plaintiff's proposed residence violated three of the restrictions was not
clearly erroneous [834-837], and members of the defendant's board or
committee owed no fiduciary duty to the plaintiff in the course of their
evaluation and rejection of his proposal [838].

CIVIL ACTION commenced in the Superior Court Department on
August 17, 1999.

Claims for declaratory judgment and breach of fiduciary duty
were heard by *Gary A. Nickerson,* J.; a claim for civil conspiracy
was heard by him on a motion for summary judgment; and a
claim for abuse of process was tried before him.

*Juliane Balliro* for the plaintiff.

*Adrienne M. Markham* (*L. Jason Law* with her) for the
defendants.

KANTROWITZ, J. In this case we review a number of issues
related to restrictive covenants applicable to a Cape Cod

[1] Ed Yaconetti, Murray Sackman, David Chapin, Larry Becht, David Dibner,
Alan Marasco, and Phil Nexon, individually and as members of the board of
directors and design review committee of the Shearwater Association, Inc.

development. Specifically, we consider (1) whether the trial court judge's finding that those covenants were enforceable was erroneous; (2) whether the trial judge erred in finding that a proposal by Donald Kline violated the covenants; (3) whether the judge's finding that the directors of the Shearwater Association, Inc. (association), owed no fiduciary duty to Kline was error; and, on cross appeal, (4) whether the trial judge erred by excluding evidence of the association's legal fees in connection with its counterclaim for abuse of process resulting in a directed verdict against it. We affirm.

*Facts.* In 1978, Harold Harris established the Shearwater subdivision in the Cape Cod town of Truro, laying out a total of sixty lots, and setting aside a twenty-one acre lot for himself. On that lot, which overlooked Cape Cod Bay, he built his own home and a separate one-room artist's studio.[2] The floor area of the main home totaled 2,950 square feet, while that of the studio totaled 530 square feet.

When he established the Shearwater subdivision, Harris drafted and recorded a declaration of protective covenants (Shearwater covenants) to govern its development.[3]

Three of the restrictive covenants are of particular significance here: (1) article III, sections 2 and 3, limiting each lot to one single family residential dwelling no larger than 4,000 square feet[4]; (2) article IV, section 1(b), prohibiting "excavation or fill which would be visible from neighboring property and which would change the topography of the Lot" except as necessary during approved construction; and (3) article IV, section 1(h)(7), requiring that the "massing and height . . . of structures shall conform to the Developer's guidelines which shall include considerations for the views of other Lots in the subdivision and the effect of the proposed structure on the rest of the subdivision." Neither the "guidelines" nor "construction

[2]Aside from the main room, the studio contained a small bathroom and storage area. It was also equipped with a hot plate used for cooking. Although the studio was primarily used by Harris's wife for painting, the Harrises occasionally used it as a guest house.

[3]The covenants were amended in February, 1982, and October, 1988.

[4]The 4,000 square foot limitation was added in 1988 in response to the Shearwater community's dissatisfaction with the construction of an 8,000 square foot home in the Shearwater subdivision in the 1980's.

specifications," mentioned elsewhere in the covenants,[5] were ever established.

Harris oversaw the development and enforced the Shearwater covenants until the mid-1990's, when he transferred his authority to the newly incorporated Shearwater Association, Inc.[6] The association was managed by a board of directors (board) which operated pursuant to the association's bylaws and oversaw the approval process for construction by owners in the subdivision. The board established a design review committee (committee) to administer the review process. Article V, section 1(a), of the Shearwater covenants provided that payments from lot owners would cover expenses incurred in the enforcement of the covenants.

When Harris sold his twenty-one acre lot at Shearwater to Donald Kline in 1997, twenty years of exposure to the elements had taken their toll on the property. As the trial judge described it, "[t]he studio was close to toppling over the bank to the beach below" and "[c]oastal erosion had eaten away at the bank to the very edge of the deck on the main residence. The wind and sand had buffeted both structures."

After acquiring the Harris property, Kline applied to the committee for permission to remove the studio and replace it with a 1,284 square foot[7] structure sixty feet back from the shore. The committee, composed of association members Murray Sackman, Phil Nexon, and Alan Marasco,[8] was skeptical that Kline intended to maintain the structure as an artist's studio, since the proposed structure contained multiple rooms with undesignated purposes. Suspecting that Kline had future plans for the entire

---

[5]For example, article IV, section 1(h)(1), provides, in pertinent part: "All improvements shall be constructed in accordance with applicable building line, set back, height provisions, and construction specifications set forth by the Developer . . . ."

[6]In the mid-1980's, Harris and other homeowners donated land to a conservation trust, which created a permanent view corridor through a "saddle" in the bank on the bay north of Kline's proposed development.

[7]The original proposal was for a 1,284 square foot building. When built, the structure measured 1,320 square feet.

[8]Prior to Kline's application, the committee also included association members Garrow Throup and David Chapin. Throup resigned from the committee, and Chapin was asked to step down when it was determined that Kline's property would directly impact his views of the ocean.

property, the committee eventually demanded that Kline submit his plans not only for the studio, but also for the main house. Kline maintained that he had no plan for the main house. In fact, Kline had already employed the design firm Geiger-Phillips to prepare detailed plans for a guest house that would replace the artist's studio, and preliminary plans for an entirely new main house.

The committee ultimately denied approval for the proposed studio in December, 1997. Kline submitted another application in January, 1998, which the committee also rejected. Kline, who had obtained building permits from the town, decided to go forward with his plan without the committee's approval and began construction in February, 1998. The association sought a preliminary injunction and a declaratory judgment. A Superior Court judge denied that request,[9] with the proviso that Kline might be required to remove the structure if he lost at trial, and Kline completed the guest house. The 1,320 square foot structure contained two bedrooms, two bathrooms, a large living/dining room area, and a full kitchen.[10]

Kline revealed his plan for the main house to the committee in October, 1998. The plan described the complete removal of the original house, and its replacement with a larger two-level structure. The first level of the structure, which the plan described as a "basement," was to be built on the same level as the existing structure. Kline would bring in approximately 10,225 cubic yards of fill to cover all sides of the building's first floor, except for the southernmost corner containing the garage. All residential functions would be on the building's second level. The site plan showed that the main house would ultimately be connected to the guest house by large areas of decking with a pool in the middle. Additionally, as proposed, the roof of the new residence would be higher than the existing structure by several feet, affecting the water views of many of the Shearwater subdivision's residents.

[9]On a joint motion of the parties, the original association action against Kline was consolidated with the Kline action giving rise to this appeal on April 26, 2000.

[10]The guest house is Kline's primary residence pending the completion of the main house. To comply with Truro zoning bylaws, Kline removed the stove from the kitchen in the main house, which the Klines have abandoned.

After extensive consideration of his application, the committee rejected Kline's plan in December, 1998, and January, 1999, on the basis of noncompliance with the covenants.[11] The committee obtained the advice of architects and designers, and went to great lengths to determine the space that would be occupied by Kline's proposed building so that the affected homeowners could visualize its impact. In order to pay the fees for these services, members of the committee contributed their own money as gifts or loans to the association. Committee member Sackman, who on two prior occasions had given money to the association for similar purposes in cases not involving Kline, alone contributed over $75,000.

In August, 1999, Kline filed an eight-count complaint against the association and individual members of its board of directors.[12] The judge dismissed various counts from which Kline does not appeal,[13] leaving only Kline's claims for civil conspiracy, ultra vires acts, breach of fiduciary duty and an accounting. The association filed counterclaims for a judgment declaring that the covenants were valid and applicable to Kline's property, and for abuse of process. The parties' claims were bifurcated, with the cross claims for declaratory judgment and the breach of fiduciary duty claim to be heard jury-waived, and Kline's civil conspiracy and the association's abuse of process claims to be tried to a jury.

---

[11]Kline simultaneously submitted his plan to the Truro conservation commission for wetlands approval. The association made an appearance at those proceedings as a party in interest. The conservation commission granted Kline approval, and the association and other neighbors appealed to the Department of Environmental Protection (DEP). The DEP affirmed the conservation commission's decision, and the association appealed to the Superior Court. After an adverse ruling there, the association appealed to this court, where the matter is pending.

[12]The complaint alleged (1) that the association's acts were ultra vires and an abuse of power; (2) breach of contract pursuant to rights established by the covenants; (3) breach of fiduciary duty; (4) civil conspiracy; (5) that the Shearwater Association must make an accounting; (6) abuse of process as to the association's declaratory judgment action; (7) abuse of process as to the association's appeal of the Truro conservation commission's decision; and (8) that the request of the board of directors for indemnification of individual board members was invalid.

[13]The judge dismissed Counts 2, 6, 7, and 8 on the association's motions pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 764 (1974).

The nonjury claims were heard over the course of thirteen days. During the trial, the judge took an extensive view of the property. He issued a detailed and well-reasoned decision, declaring that the covenants were valid and enforceable against Kline, that his proposal was prohibited by the covenants, and that the association and its members had not violated a fiduciary duty owed to Kline or committed any ultra vires acts.[14] On the accounting claim, the judge concluded Kline had been given an accounting, and adjudged the claim moot.

On the remaining jury claims, both parties filed motions for summary judgment. The association's motion (dismissing the civil conspiracy claim) was allowed, while Kline's motion was denied; the association's abuse of process claim proceeded to a jury trial, which concluded in the allowance of Kline's motion for a directed verdict, at the close of the association's case.

Both parties filed timely notices of appeal.[15]

*Validity of the Shearwater covenants.* We begin with Kline's argument that the trial judge applied the wrong legal standard in determining that the Shearwater covenants were valid. Kline also contends that the judge misapplied the factors outlined in G. L. c. 184, § 30. We disagree and hold that the Shearwater covenants are enforceable.

"[R]estrictions on land are disfavored, and they 'in general are to be construed against the grantor.' " *Stop & Shop Supermarket*

---

[14]The acts complained of included (1) the association's action seeking a declaration concerning the guest house; (2) the association's participation in the conservation commission hearings opposing Kline's notice of intent to rebuild the single family residence and subsequent appeal to the DEP; and (3) the association's appeal of the DEP decision to the Superior Court and request for hearing.

[15]Kline also filed a motion for a new trial on the jury-waived claims, and simultaneously sought to vacate the order for summary judgment on the civil conspiracy claim, both of which were denied. In his decision on the motion for a new trial and to vacate summary judgment on the civil conspiracy claim, the judge modified a finding from his decision following the jury-waived trial. Originally, he determined that the association's board of directors owed an allegiance to Kline, as an individual member of the association, in the discharge of their duties. In abandoning that determination, the judge reasoned that *Office One, Inc.* v. *Lopez,* 437 Mass. 113 (2002), dictated that no such relationship existed as a matter of law between members of the board and Kline as an individual association member.

*Co.* v. *Urstadt Biddle Properties, Inc.*, 433 Mass. 285, 290 (2001), quoting from *Ward* v. *Prudential Ins. Co.*, 299 Mass. 559, 565 (1938). Nonetheless, "they have to be construed 'with a view of avoiding results which are absurd, or inconsistent with what was meant by the parties to or the framers of the instrument.' " *Maddalena* v. *Brand*, 7 Mass. App. Ct. 466, 469 (1979), quoting from *Chase* v. *Walker*, 167 Mass. 293, 297 (1897).

In determining whether a restrictive covenant is enforceable, a reviewing court must look to the statutory factors delineated in G. L. c. 184, § 30, inserted by St. 1961, c. 448, § 1. First, the court must determine if the restriction in question is "of actual and substantial benefit to a person claiming rights of enforcement." *Ibid.* Even if the court finds such a benefit, it must still determine if any of the five statutory exceptions are applicable.[16] See *Connaughton* v. *Payne*, 56 Mass. App. Ct. 652, 655-656 (2002).

---

[16]The five exceptions are:

"(1) changes in the character of the properties affected or their neighborhood, in available construction materials or techniques, in access, services or facilities, in applicable public controls of land use or construction, or in any other conditions or circumstances, reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by award of money damages, or

"(2) conduct of persons from time to time entitled to enforce the restriction has rendered it inequitable to enforce except by award of money damages, or

"(3) in case of a common scheme the land of the person claiming rights of enforcement is for any reason no longer subject to the restriction or the parcel against which rights of enforcement are claimed is not in a group of parcels still subject to the restriction and appropriate for accomplishment of its purposes, or

"(4) continuation of the restriction on the parcel against which enforcement is claimed or on parcels remaining in a common scheme with it or subject to like restrictions would impede reasonable use of land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas, or

"(5) enforcement, except by award of money damages, is for any other reason inequitable or not in the public interest."

G. L. c. 184, § 30.

With regard to the covenants, the judge found that:

> "[T]he Shearwater covenants convey an actual and substantial benefit on the Association and, in turn, the individual lot owners. Together the various sections of the declaration of covenants form a unified scheme calculated to protect the values set forth in the preamble of the declaration.[17] Nothing in the covenants impedes the reasonable use of the land. The land is best suited to dispersed residential use. The sandy soils are susceptible to erosion by wind and water. The topography of Shearwater is treated in the covenants as an asset, not an enemy, to reasonable development. The covenants do not run counter to public policy."

This court has previously concluded that covenants purporting to provide benefits similar to those at issue here are enforceable. See, e.g., *Gulf Oil Corp.* v. *Fall River Hous. Authy.*, 364 Mass. 492, 500 (1974) (intent of restriction "to assure the orderly and mutually beneficial development of the entire area"); *Atwood* v. *Walter*, 47 Mass. App. Ct. 508, 513 (1999) (purpose of covenant was "to create and preserve . . . aesthetic qualities and values"); *Connaughton* v. *Payne*, 56 Mass. App. Ct. at 657 (purpose of restriction was "to limit development on the plaintiff's property [in order to] maintain and nurture the ecosystem that currently thrives on the defendants' property" [quotations omitted]).

The Shearwater covenants, in the benefits they provide, are similar to those in the aforementioned cases, providing an actual

---

[17]Those "values," as described in the preamble to the Shearwater covenants, are:

> "to create a community which will ensure and protect the full enjoyment of the historical traditions and natural advantages of the Truro area . . . while encouraging diverse individual expression within the environment. . . . The developer desires to protect the investments of all lot and home owners; to prevent the erection of poorly designed structures; to encourage the erection of attractive homes; to secure proper and pleasing site development; and to assure a high quality of community appearance; to conserve the native vegetation and to preserve the natural beauty of the land."

and substantial value to the association's members. Kline cannot demonstrate otherwise. They are valid.[18]

Kline next argues that even if the covenants are legally acceptable, two exceptions found in G. L. c. 184, § 30 — the second and the fifth (see note 16, *supra*) — prevent their enforcement.

First, he claims that the association effectively waived enforcement of the covenants by not previously subjecting Harris's property to the single dwelling restriction. We agree with the trial judge that "[n]o credible evidence was adduced at trial to prove a systemic waiver of the covenants." The judge further determined that the Harris property was in compliance with the covenants during the period of Harris's ownership.

Next, Kline directs our attention to the fifth exception of § 30, claiming that it would be inequitable to enforce the fill restriction, article IV, section 1(b), of the Shearwater covenants because it contains no quantifiable standards. The judge found this statutory exception inapplicable, and we agree. The fill restriction prohibits "[e]xcept to the extent reasonably necessary during [] construction . . . for which the Owner has obtained written approval . . . excavation or fill which would be visible from neighboring property and which would change the topography of the Lot." The fact that the restriction does not specify the exact amounts of fill permitted to be added to or excavated from a lot at Shearwater does not render it unenforceable. See *Donoghue* v. *Prynnwood Corp.*, 356 Mass. 703, 707 (1970) ("a restriction . . . should be interpreted as requiring . . . that the person whose approval is required shall decide

---

[18]Kline argues that the judge committed reversible error by citing a California case for the proposition that the court should uphold an association's determination where the association "acts in good faith and in the best interests of the community." We need not determine whether the California courts accord a greater level of deference to homeowners associations than that due to such associations in the Commonwealth. Compare *Nahrstedt* v. *Lakeside Village Condominium Assn.*, 8 Cal. 4th 361, 374 (1994) ("Generally, courts will uphold decisions made by the governing board of [a condominium] owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy"), with *Donoghue* v. *Prynnwood Corp.*, 356 Mass. 703, 707 (1970) (restrictive covenant may be enforced where "power to do so is exercised reasonably"). There is nothing in the judge's thorough analysis of the issues to support a conclusion that he improperly deferred to the association's decision.

objectively, honestly, and reasonably"). Compare cases scrutinizing local subdivision plan regulations, G. L. c. 41, § 81Q, for impermissible vagueness under the rule of *Castle Estates, Inc.* v. *Park & Planning Bd. of Medfield*, 344 Mass. 329, 334 (1962), e.g., *North Landers Corp.* v. *Planning Bd. of Falmouth*, 382 Mass. 432, 440 (1981) ("Albeit broad in connotation, the term 'adequate access,' or such cognates as 'suitable' and 'satisfactory,' runs like a leitmotif through the law of subdivision control; and courts have had little difficulty applying its basic meaning under different factual circumstances" [footnote omitted]); *Windsor* v. *Planning Bd. of Wayland*, 26 Mass. App. Ct. 650, 658 (1988) (claim that planning board's subdivision approval letter was "too vague in describing certain of its conditions — e.g., that the owner preserve as many trees 'as possible,' that owner build a retaining wall if it is 'not possible' to blend the edges of the subdivision — invokes a criterion of definiteness impractical or excessively stringent for the items in question"). Indeed, whether the fill "is visible from neighboring property" and "change[s] the topography of the Lot" are definite standards that adequately inform interested parties what is required of them under the covenant. See *ibid.*

In conclusion, the judge's determination that the Shearwater covenants were enforceable was correct.

*Application of the Shearwater covenants to Kline's property.* Kline contends that the judge erred in finding his proposal would violate three of the restrictions contained in the Shearwater covenants: the square footage limitation; the excavation restriction; and the massing and height restriction.[19]

1. *The square footage covenant.* We agree with the judge's conclusion that Kline's proposed structure violated the 4,000 square foot limitation. Specifically, the judge found that Kline's proposed "dwelling" would exceed 9,000 square feet.

Article III, section 3, of the Shearwater covenants reads:

"No dwelling shall be erected which contains less than

---

[19]We note that we could affirm by holding that Kline violated any one of the covenants, without addressing the other violations. To avoid future uncertainty and litigation, however, we choose to address all of the violations found by the judge.

1,000 square feet of permanently enclosed ground floor area, exclusive of porches, breezeways, or garages. No dwelling shall be erected which contains less than 1,500 square feet or more than 4,000 square feet of permanently enclosed total floor area, exclusive of porches, breezeways, garages, attics and basement areas."

Kline's proposed structure consisted of two stories. He claimed that the second floor comprised 3,996 square feet. The judge determined the area of the second floor to be 4,220 square feet. Kline arrived at his figure by measuring the floor space from interior wall to interior wall, an apparently somewhat novel method used by no one other than Kline. We cannot fault the judge for determining that the phrase "permanently enclosed floor area" as used in article III, section 3, required use of the gross calculation method, which entailed the standard practice of including the exterior walls of a particular structure. The judge observed that "[Kline's] designer Geiger-Phillips, who participated in the drafting of the covenants and who has designed and built the majority of the houses in Shearwater, constantly used a gross calculation before and after Kline's project."

The judge's finding that the second floor of Kline's proposed house, excluding the lower level and the guest house, violated the square footage limits in article III, section 3, of the covenants was not clearly erroneous.

The judge further found that both levels of Kline's proposed house should be included in the calculation of the "permanently enclosed total floor area," and arrived at a figure for the area of the main house of approximately 8,000 square feet. Kline protests, claiming that the first level of the proposed house is a basement, and therefore not to be included in the total square footage pursuant to article III, section 3. The judge expressly found, however, that because Kline planned to bring in over 10,000 cubic yards of fill, weighing several tons, to situate the first level below grade, it was not a basement as envisioned by the Shearwater covenants. The judge's determination that the lower level of Kline's proposed house, created through the importation of fill which would raise the elevation of the structure overall, and partially bury the building's first floor, did not constitute basement space is not clearly erroneous.

Finally, in determining that under Kline's proposal the total square footage on the lot would increase to approximately 9,000, the judge included the area of the completed guest house. Kline argues that this was error because (1) the guest house is an "accessory structure" and therefore exempt from the calculation of the total square footage, as permitted by article III, section 2, of the covenants; and (2) a "dwelling," as contemplated by the covenants, can include only one residential structure.

Article III, section 2, of the Shearwater covenants permits on a lot within the subdivision "accessory non residential structures such as tool sheds, pools and fences," in addition to one single-family dwelling.[20] The plain language of this section leads to the inescapable conclusion that Kline's guest house, which contained two bedrooms, two bathrooms, a living/dining room and a full kitchen, was not an "accessory non residential structure[]."

Kline maintains that the kitchen would be removed from the guest house once the main house was completed, thus transforming the structure into something short of residential. The judge determined that an integrated deck would connect the main house with the guest house; the two structures would share a common parking area, and a swimming pool would be located between them. Whether a particular structure qualifies as "residential" depends not necessarily on its architectural qualities, but rather on its use. See, e.g., *Amari* v. *Rent Control Board of Cambridge*, 21 Mass. App. Ct. 598, 604 (1986) (deferring to board's determination that unit was residential because of its primary use). It is difficult to envision the guest house here as anything other than residential,[21] and the judge did not err when he aggregated its area in the total square footage of the dwelling on Kline's lot.

2. *The topography/excavation/fill covenant.* Kline challenges the judge's finding that the proposal would violate the excava-

---

[20]The section provides: "No structures other than one single-family dwelling to be used for residential purposes, garages for not more than three (3) cars, and accessory non residential structures such as tool sheds, pools, and fences shall be erected, placed or allowed to remain on any Lot."

[21]That being the case, it might be considered a second structure and thus afoul of the covenants, which allow for only one dwelling on a lot.

tion restriction set out in article IV, section 1(b).[22] That section forbids "excavation or fill which would be visible from neighboring property and which would change the topography of the Lot." The judge found that there was a "clear factual basis for the Committee's conclusion," and that "Kline's proposal significantly changes the existing land form and imposes a structure of substantially greater mass and height than that now on the lot." Kline has not demonstrated that the judge's conclusion is in error. Moreover, when the trial judge has had an opportunity to take an extensive view of the property in question before making a decision, as he did here, "we would be hard pressed to reach the opposite result." *Connaughton* v. *Payne*, 56 Mass. App. Ct. at 657.

3. *The massing and height restriction.* Finally, Kline argues that the judge erred by finding his proposal would violate the massing and height restriction set forth in article IV, section 1(h)(7).[23] He suggests that the covenant does not specifically protect views of the water, but views generally. Common sense dictates, however, that a substantial reason for property owners to acquire land on the Cape Cod coast is to have an ocean view and that the words "views of other Lots" and "effect of the proposed structure on the rest of the subdivision" refer to sight lines to the ocean. The record contains exhibits showing computer generated images of the visual impact of Kline's proposed residence on other lots in the subdivision. Furthermore, the judge extensively viewed the property in person. His conclusion that Kline's proposed house would obstruct the views from a number of lots in the Shearwater subdivision is not clearly erroneous.

---

[22]The section provides: "Except to the extent reasonably necessary during the construction, reconstruction or alteration of any improvement for which the Owner has obtained written approval from the Developer pursuant to this Article or except where such excavation, filling or changing of topography or the natural or existing drainage for surface waters is approved in writing by the Developer, no excavation or fill which would be visible from neighboring property and which would change the topography of the Lot shall be created or installed upon said Lot and no change in the natural or existing drainage for surface waters shall be made on said Lot."

[23]The section provides: "The massing and height, in particular, of structures shall conform to the Developer's guidelines which shall include considerations for the views of other Lots in the subdivision and the effect of the proposed structure on the rest of the subdivision."

*Fiduciary duty.* Having found that the Shearwater covenants were enforceable against Kline, and that his proposed residence violated at least three of the restrictions contained therein, we may now quickly dispose of the issue whether members of the board or the committee breached any fiduciary duty owed to Kline in the course of their evaluation and rejection of his application. As the trial judge properly ruled, neither the board nor the committee owed a fiduciary duty to Kline individually. See *Cigal* v. *Leader Dev. Corp.*, 408 Mass. 212, 219 (1990); *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 125 (2002); *Berish* v. *Bornstein*, 437 Mass. 252, 269 n.29 (2002). As Kline does not suggest that the committee's denial of his application breached their duty to the association, his argument is without merit.[24,25]

*Judgments affirmed.*

---

[24]The association's argument on appeal that the judge erred in excluding evidence at the jury trial that Kline was ultimately unsuccessful on all eight of the claims he brought against the association is without merit. Exclusion of the evidence was within the judge's discretion, especially where such evidence could have proved unduly prejudicial to the jury hearing the association's abuse of process claim. In any event, the association suffered no harm as a result of the ruling, where the judge stated that the association had satisfied its burden on liability on its abuse of process claim.

[25]On the abuse of process cross claim, we affirm. While the association might have rightfully claimed legal fees as damages in this case, it still had to be proved. It was within the judge's discretion to require expert testimony as to the unreasonableness of the attorney's fees. See *American Velodur Metal, Inc.* v. *Schinabeck*, 20 Mass. App. Ct. 460, 467 (1985). So, too, the judge acted within his discretion in requiring the association to parse its legal fees. See *id.* at 467-468. See also *Boston* v. *U.S. Gypsum Co.*, 37 Mass. App. Ct. 253, 260-261 (1994). In the face of the adverse ruling, the association basically requested that a directed verdict be entered against it. As such, it cannot now claim error. See *Blais-Porter, Inc.* v. *Simboli*, 402 Mass. 269, 274 (1988).