NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-1734                                          Appeals Court

BOSTON REDEVELOPMENT AUTHORITY vs. JEFFREY PHAM & another.[1]

No. 14-P-1734.

Suffolk.     October 1, 2015. - December 9, 2015.

Present:  Kafker, C.J., Katzmann, & Rubin, JJ.

Housing.  Redevelopment Authority.  Deed.  Real Property, Deed, Condominium.  Condominiums, By-laws, Master deed. Practice, Civil, Findings by judge, Attorney's fees.

Civil action commenced in the Superior Court Department on December 1, 2010.

The case was heard by Bonnie H. MacLeod, J., and a motion for attorney's fees and costs was heard by her.

Edward S. Englander (Shannon F. Slaughter with him) for the plaintiff.
James A. Schuh for Jeffrey Pham.

KAFKER, C.J.  In this case we must decide whether Jeffrey

Pham violated affordable housing restrictions established by the

Boston Redevelopment Authority (BRA) that (1) required Pham to

_____

[1] Andrew Carpentier.  A stipulation of dismissal as to Carpentier was entered in the Superior Court on May 31, 2011.

maintain his condominium unit as his principal residence, and (2) prohibited him from leasing his unit for business or investment purposes. As we discern no error in the Superior Court judge's determination that Pham continued to occupy his condominium unit as his principal residence despite his extensive work-related travel, and that he did not violate any deed or other covenants when he took in a succession of roommates to share the space and defray the carrying costs of the unit, we affirm.

1. Background.[2] a. 2007 purchase of affordable housing unit. Having won a housing lottery and been approved by the BRA, on June 1, 2007, Jeffrey Pham purchased unit 413, a two-bedroom affordable condominium unit at 2400 Beacon Street in the Chestnut Hill section of Boston (unit or premises). His application stated that his sister, a college student, would live in the unit with him. Pham signed a number of documents relative to his purchase of the unit, including the unit deed, a deed rider covenant for affordable housing (covenant), a note, and a mortgage identifying the BRA as the mortgagee. In addition, recorded with the unit deed is an affirmation signed

---

[2] The facts underlying this case were developed in a jury-waived trial. The BRA called three witnesses: Andrea Laing, the Assistant Director of Affordable Housing Compliance at the BRA during the relevant time period; Carpentier, Pham's last roommate; and Pham. Pham testified on his own behalf and did not call any other witnesses. Twenty-nine exhibits were admitted in evidence.

by Pham accepting the unit deed and agreeing to its provisions along with the provisions of the master deed and declaration of trust,[3] including the by-laws and rules and regulations adopted by the trustees of the condominium.  Both as part of his application and yearly thereafter, Pham executed an affidavit averring that he occupied the unit as his principal residence.

The purpose of the covenant, as stated in its preliminary statement, "is to provide a uniform plan for administration and enforcement of covenants and restrictions imposed upon real property by the City of Boston and the Boston Redevelopment Authority . . . [to] regulat[e] the development of real property for housing for persons of moderate and middle income."  The covenant is imposed "to mitigate the impacts of market rate housing on the supply and costs of housing for moderate and middle income households."  More simply, "With this help, many families who could not afford to purchase a home in the private market will be able to own their own home."

The covenant constitutes a part of the consideration paid for affordable housing properties.  The covenant defines "Premises" as "the real property conveyed by or described in the Deed . . . ."  Section 4 of the covenant provides:

_____

[3] The declaration of trust establishes an organization of unit owners to hold, exercise, manage, and administer the common elements of the condominium for the benefit of the unit owners pursuant to G. L. c. 183A.

"[t]he Owner shall occupy the Premises as his . . . principal residence.  Notwithstanding the foregoing, Owner may lease the Premises only upon receiving prior written approval from the [BRA], provided that the rent paid by the lessee is not greater than one hundred fifteen percent (115%) of the Owner's then current monthly housing costs."

The mortgage itself does not contain any restrictions on rentals or roommates, but does provide that it secures the repayment of the indebtedness and the covenants and restrictions set forth in the note, the mortgage, "and in all other documents now or hereafter executed by the Mortgagor incident to Mortgagor's purchase of the Premises . . . ."  The BRA points to two of those documents, the master deed and the by-laws of the condominium trust, as prohibiting Pham's conduct.[4]

Section 7 of the master deed is entitled "Use of Units and Common Elements."  Section 7A of the master deed first restricts the general use of units to residential purposes only, "with no more than two (2) unrelated persons per bedroom . . . ."  Section 7B of the master deed provides:

"It is the Intent of this Master Deed that the Units shall be owner-occupied, and that any owner-occupant

---

[4] Pham filed a motion in limine seeking to prevent the BRA from relying on anything other than the covenant as no other document was brought to Pham's attention by the BRA's presuit communications, complaint, or discovery.  The record does not reflect the action the judge took on the motion except that her decision does discuss the master deed and declaration of trust, indicating that she at least implicitly denied the motion.  Pham does not specifically argue that the judge erred in denying the motion.  Given that the documents are incorporated by reference in the documents which were cited in the briefs on appeal, we discern no error in the judge's consideration of them.

requirements of the Affordable Housing Agreement and the LDA be strictly enforced.[5]  Therefore, the leasing of Units to others as a regular practice for business, speculative, investment or other similar purpose shall not be permitted.  Additionally, and notwithstanding any other provision herein to the contrary, no Affordable Unit may be occupied by anyone other than its owner or leased to anyone without the express written consent in advance of the municipality as set forth in the LDA.  To meet special situations and to avoid undue hardship in particular instances, the Trustees may grant permission to a Unit Owner to lease the Unit Owner's Unit to a specified lessee for a period of not less than twelve consecutive months and not more than eighteen consecutive months."

Section 18A of the by-laws of the trust addresses rentals permitted by § 7B of the master deed.  It provides that any lease of the premises shall be in writing "and apply to the entire Unit and not merely a portion thereof" (emphasis added).

b.  Pham's use of unit.  Pham admitted at trial that after his sister moved out in late 2009, he had a succession of roommates who contributed to the payment of his housing costs. He allowed the roommates to use the master bedroom and he used the smaller bedroom vacated by his sister.  Pham shared the rest of the unit with the roommates.  He had no formal lease or contract arrangement with them.

The record reveals that Pham's total monthly housing costs were approximately $3,000 and the most any roommate paid was $1,500 per month.  There is no suggestion in the record that

---

[5] The master deed defines LDA as the "Amended and Restated Land Disposition Agreement."  Neither the LDA nor the affordable housing agreement are contained in the record.

Pham received money approaching or exceeding his total housing costs. His last roommate departed in May, 2011.

It is uncontested that Pham traveled extensively for his job. He conceded he frequently was absent from the unit, even for weeks at a time. He traveled to South Carolina, where the business he worked for was based, and he also traveled abroad for work. In addition, he spent time in New Jersey where his girlfriend, now wife, lived. He continued to use the unit, however, as his home base. He kept the majority of his "valuable possessions" in the unit. The master bedroom and common living areas remained furnished with his furniture. The utilities remained in his name and he paid those bills. He identified the unit as his address for tax purposes. Furthermore, during the period in question, he did not rent or buy a residence in either South Carolina or New Jersey. He testified he frequently stayed with his boss when in South Carolina.

c. _BRA investigation_. The first complaints claiming that Pham was not occupying his unit came to the BRA from a trustee of the condominium in or about April, 2010. In the course of correspondence over the ensuing weeks, the trustee alleged that Pham had been renting out his unit for over a year and, as a trustee, had missed all but one trustee meeting. Following some communications with Pham, the BRA informed him by letter on

August 4, 2010, that he was in violation of the covenant and requested a meeting with him, apparently as part of its investigation.  By letter dated October 21, 2010, the BRA informed Pham that its investigation had been completed and that it had concluded that he was "in violation of Section 4 of the Covenant because he [did] not occupy the Unit and he ha[d] leased the Unit without the prior written approval of the BRA." The BRA indicated it would bring legal action against him if he did not, among other things, (i) provide proof that his current tenant or roommate no longer resides at the premises; (ii) account for and present a plan to pay to the BRA any monies received from roommates; and (iii) arrange to sell the unit to another qualified buyer within six months.  Pham did not comply with the BRA's requests.

On December 1, 2010, the BRA filed a complaint in the Superior Court alleging that Pham violated the covenant and his mortgage by (i) failing to occupy the premises as his principal residence, and (ii) renting the premises without the permission of the BRA.  The BRA sought an accounting in addition to an order instructing Pham to convey the unit to a qualifying affordable housing buyer.

The judge concluded that Pham continued to occupy the unit as his principal residence.[6]  With regard to renting the unit, the judge found that the covenant and other documents do not clearly prohibit him from having a roommate, even one who contributes to the monthly housing costs, without the BRA's approval.  The judge dismissed the BRA's complaint and pursuant to the covenant, awarded Pham attorney's fees.  The BRA appeals and Pham cross appeals, claiming that the judge should have awarded his "actual" fees, without reduction.

2.  Discussion.  Principles of deed and contract interpretation guide our discussion of the issues.  In interpreting a deed, as with any contract, we "must construe all words that are plain and free from ambiguity according to their usual and ordinary sense."  Suffolk Const. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999).  Deed restrictions are, however, "to be strictly construed against the party seeking to enforce" them.  Walker v. Gross, 362 Mass. 703, 706 (1972).  See Kline v. Shearwater Assn., Inc., 63 Mass. App. Ct. 825, 830-831 (2005).  "Where a person's right to use his or her own property is involved, any ambiguity in an asserted restriction . . . should be construed in favor of the freedom of the property from that restriction."  Johnson v. Keith, 368

---

[6] The judge also pointed to the fact that the BRA served the complaint on Pham at the unit.

Mass. 316, 320 (1975). This is also consistent with the general rule that ambiguous contractual language is construed against its author. See Beatty v. NP Corp., 31 Mass. App. Ct. 606, 612 (1991). Finally, "[w]ords that are clear and unambiguous, by themselves, may be ambiguous when read in the context of the entire [instrument], or as applied to the subject matter." Jefferson Ins. Co. of N.Y. v. Holyoke, 23 Mass. App. Ct. 472, 475 (1987).

a. Occupancy as principal residence. Section 4 of the covenant unambiguously requires Pham to occupy the unit as his principal residence. Whether Pham occupied the unit as his principal residence is a mixed question of law and fact. Shepard v. Finance Assocs. of Auburn, Inc., 366 Mass. 182, 189 (1974). As the party seeking to enforce the principal residence requirement, the burden was on the BRA to prove that Pham failed to occupy the unit as his principal residence, and we review the judge's findings for clear error. See Dotson v. Commissioner of Rev., 82 Mass. App. Ct. 378, 384 (2012) (burden of proof of change of domicil falls on party asserting change).

The phrase "occupy as principal residence" is not defined in the covenant or elsewhere. The BRA points to application materials where a preference is given to "Boston Residents," defined as persons who "normally eat[], sleep[] and maintain [their] normal personal and household effects" in Boston, and

suggests that those same parameters and other parameters, such as frequency of physical presence, govern the analysis.  The BRA's main contention is that Pham was not physically present in the unit enough to satisfy the occupancy requirement.

The Supreme Judicial Court has noted that "[t]he main lesson to be drawn from our cases interpreting the meaning of the word 'residence' is that it is a word 'of flexible meaning.'"  Shepard, 366 Mass. at 190.  "Residence is a word of varied meanings, ranging from domicil[7] down to personal presence with some slight degree of permanence."  Rummel v. Peters, 314 Mass. 504, 511 (1943).  While it was certainly open to the BRA to draft the covenant in such a way as to impose a minimum number of days per week, month, or year of physical presence to the occupancy requirement, it did not do so.[8]  The judge, therefore, reasonably considered multiple factors in determining whether Pham maintained the unit as his principal residence, including his living arrangements elsewhere.  Those factors recounted by the judge in her findings establish that

---

[7] "Domicil has been defined as 'the place of one's actual residence with intention to remain permanently or for an indefinite time and without any certain purpose to return to a former place of abode.'"  Caffyn v. Caffyn, 441 Mass. 487, 492 (2004), quoting from Fiorentino v. Probate Ct., 365 Mass. 13, 17 n.7 (1974).

[8] The BRA representative testified that there was no rule regarding the number of days Pham had to be physically present in the unit, as long as it remained his primary residence.

the unit was Pham's principal residence as he neither leased nor owned property elsewhere, and despite his extensive travel necessitated by his employment, he continued to use the unit as his home base. There was testimony that Pham retained a room in the unit and was physically present in the unit one to two weeks per month. He maintained his valuable personal possessions there. He identified the unit as his address for tax and other official purposes and the BRA served him there. The utilities remained in his name and he paid the bills.[9]

We discern no intention reflected in the BRA documents to prevent purchasers of affordable housing units from pursuing or taking jobs that require frequent travel, provided they maintain the affordable housing unit as their home base. Indeed, any such restrictions on employment appear inconsistent with the goals of assisting persons of moderate and middle income to thrive in difficult economic circumstances as reflected in the covenant. While Pham's frequent absences required careful inquiry on the primary residence question, the judge undertook such an inquiry and reasonably concluded that Pham's principal

---

[9] The judge was not required to draw an adverse inference from Pham's initial failure to change his license and car registration to his Boston address from his parents' home in Northborough, where he often garaged his car. There was no indication that he made any other use of his parents' home and the BRA does not suggest he resided there. When the BRA brought the oversight to his attention, he changed both and by the time of trial, the judge noted that his driver's license and car registration bore the address of the unit.

residence remained unchanged, despite the travel necessitated by his employment and desire to see his out-of-town girlfriend, who eventually became his wife.

In sum, in these circumstances, we discern no error in the judge's determination that Pham did in fact occupy the unit as his principal residence throughout the period in question.[10]

b. <u>Roommates</u>. We turn next to the question whether Pham violated provisions in the covenant, master deed, and trust by-laws when he replaced his sister with roommates who contributed as much as $1,500 toward his $3,000 monthly housing costs in return for their use of the master bedroom suite and shared space. The express intention of the documents is to promote and require owner occupation of the unit as a personal residence. See § 4 of the covenant ("The owner shall occupy the Premises"); §§ 7A and 7B of the master deed ("The units are to be used only for residential purposes by the Unit Owner and members of the Unit Owner's household unit"; "the Units shall be owner-occupied"). Consistent with this purpose, the documents together explicitly prohibit the unit owner's right to lease the unit for business, speculative, investment, or other purposes.

---

[10] The BRA contends that the judge erred in declining to grant its motion for relief from judgment because it learned that after trial, in February of 2014, Pham purchased a home with his wife in New Jersey. The judge correctly denied the motion as involving posttrial events, and "thus not relevant in any way." The record does reflect that Pham sold the unit in due course after purchasing the New Jersey home.

See § 7B of the master deed ("the leasing of Units to others as a regular practice for business, speculative, investment or other similar purpose shall not be permitted"). All these prohibitions, and the associated remedies, are directed at the leasing of the entire unit. See § 18A of the by-laws ("To the extent that a Unit Owner is permitted to lease its Unit as set forth in Section 7.B of the Master Deed, any lease or rental agreement . . . shall . . . apply to the entire Unit and not merely a portion thereof); § 20(c) of the covenant (for prohibited leases, the BRA shall be entitled to "money damages for charges in excess of maximum rents"). As we have previously concluded, Pham is an owner occupier of the unit for residential purposes. He has not leased the entire unit for business, speculative, or investment purposes. Rather he has brought in roommates who pay a portion of his carrying costs of the unit.

None of the documents expressly prohibit subleases, roommates, lodgers, or boarders as they could have done.[11,12] At

--------

[11] The concepts of lodger or licensee may more aptly describe the relationship between Pham and his roommates than landlord-tenant. See Warshaw, Massachusetts Landlord-Tenant Law § 1.9, at 18 n.31 (2d ed. 2001), quoting from Hall, Massachusetts Landlord-Tenant Law § 3, at 3 (1949) (if party does not "have exclusive possession of premises against all the world including owner," there is no tenancy but rather party is licensee). We noted in Hall v. Zoning Bd. of Appeals of Edgartown, 28 Mass. App. Ct. 249, 254 (1990), quoting from Webster's Third New Intl. Dictionary 1329 (1971), that the dictionary definition of lodger is "one who by agreement with the owner of housing accommodations acquires no property,

oral argument, the BRA conceded that roommates are not prohibited nor do they require prior approval as long as they are family members or close personal friends. The BRA rather contends that having paid roommates who are not family members or friends transforms the use of the unit into a "business" or other use prohibited by the master deed. We disagree. As the judge found, Pham is using the unit as his primary residence and accepting roommates to defray his carrying costs. Section 7A of the master deed also specifically provides that unrelated persons may occupy the unit. The covenant contains a broad definition of household: "all persons who reside or intend to reside together at the Premises." Neither the master deed nor the covenant prohibits unrelated or unfamiliar persons from living together, nor do they require BRA approval of household members. We therefore discern no support for the BRA's

interest, or possession therein but only the right in accordance with the agreement to live in and occupy a room or other designated portion therein that still remains in the owner's legal possession." The lodger has no interest in the real property but only a contractual relationship with the owner. See ibid. A roommate, most commonly, is a mere licensee. Warshaw, Massachusetts Landlord-Tenant Law § 1.9[C].

[12] In contrast, a sample Boston Housing Authority lease specifically provides that a resident "agrees not to assign this lease, not to sublet or transfer possession of the Apartment, not to take in boarders or lodgers and not to use or permit the use of the Apartment for any purpose other than as a private dwelling solely for Resident and the individuals specifically listed on this lease or listed on a subsequent written Lease Addendum." Daher & Chopp, Landlord and Tenant Law § 22.18, at 143 (3d ed. 2001).

assertion that only family members or persons with close personal relationships may live as a roommate with the owner without transforming it into a business investment.

The fact that a roommate pays a portion of the unit owner's carrying costs is a factor to consider in our legal analysis of the restrictions and prohibitions in the different documents but it is not dispositive. As the judge points out, Pham's housing costs exceeded fifty percent of even his pretax monthly income. It would have been difficult indeed for Pham to maintain his personal housing costs without the assistance of first his parents on behalf of his sister (something that the BRA acknowledges in its brief on appeal) and then the roommates who shared the unit with him. The controlling documents do not prohibit Pham from making the personal financial decision to share his housing unit with a roommate who is not a family member or friend in order to reduce his costs and make the unit more affordable. If the BRA intended to preclude such a decision, with the resulting financial pressures it thereby places on the moderate and middle income owner occupiers it intends to serve, it must do so unambiguously. Compare Boston Housing Authority lease provision quoted in note 12, supra.

In so concluding, we acknowledge the sentence in § 7B of the master deed, which states, "no Affordable Unit may be occupied by anyone other than its owner or leased to anyone

without the express written consent in advance of the municipality as set forth in the LDA" (emphasis added).  This single sentence regarding occupation has not been a focal point of the litigation.  The BRA never identified this language in the master deed when it notified Pham that he was in violation of the covenant, nor did it identify this language in the complaint as purporting to require prior BRA approval of roommates.  The sentence, and the potentially broad controlling sweep of its restriction regarding occupation of the unit, has not been repeated elsewhere in the extensive documentation governing the unit.  The absence of such language from the covenant, the principal document governing the affordable housing aspect of the transaction, is conspicuous.  There are also no specific financial remedies for unauthorized roommates, lodgers, boarders, or others sharing the unit and its expenses with the owner.

Indeed, situated as it is between provisions requiring owner occupation and controlling rental of the entire unit, it remains unclear to us whether this sentence in § 7B requires written consent for a person to occupy a room and shared space in the unit when the owner also continues to occupy the unit.  See Jefferson Ins. Co., 23 Mass. App. Ct. at 475 (ambiguity may arise from context in which relevant language appears).  In construing substantially similar lease language prohibiting a

tenant from allowing any other person to occupy the leased premises, the Supreme Judicial Court concluded that a lodger taken in by the tenant to occupy one of the rooms for a fee, did not "occupy" the premises in violation of the covenant and such an arrangement was "not a leasing or underletting" of the premises." Peaks v. Cobb, 197 Mass. 554, 555 (1908).[13]  While there may very well be affordable housing goals served by restricting and requiring approval of anyone who occupies an affordable housing unit with an owner, the BRA must incorporate clearer language to do so.  Compare Boston Housing Authority lease provision quoted in note 12, supra.  Read as a whole, the condominium documents at issue are at least ambiguous with regard to whether Pham required the BRA's approval to share his unit with a roommate.  See Jefferson Ins. Co., supra.

For all of the foregoing reasons, therefore, we agree with the judge that in this regard, the clause is at least ambiguous and should not be construed against Pham.

c.  Attorney's fees.  We turn finally to the issue of attorney's fees.  Pham was awarded $92,720.95 on his initial

---

[13] The lease covenant provided that the tenant could not "lease, nor underlet, nor permit any other person or persons to occupy  . . . [the premises]" without the approval of the lessor.  Peaks, 197 Mass. at 554-555.

application for attorney's fees and costs[14] and $4,367.60 on his supplemental application for attorney's fees and costs. The judge denied Pham's second supplemental application for additional fees and costs of $2,232.50, stating, "the Court believes that the prior fees and costs allowed represent reasonable compensation for all pre-appeal services." On appeal, Pham argues that the judge erred in denying his second supplemental application because the covenant entitles a prevailing party to all the attorney's fees he incurred.[15] We disagree.

The covenant provides that "[i]f any action is brought to enforce this Covenant, the prevailing party shall be entitled to actual attorneys [sic] fees and other costs of bringing the action, in addition to any other relief or remedy to which such party may be entitled." Relying on Carter v. Warren Five Cents Sav. Bank, 409 Mass. 73 (1991), Pham argues that because the covenant provides for the prevailing party to be awarded "actual" attorney's fees, he was entitled to all legal charges

---

[14] Pham requested $93,296.60 in his initial application for attorney's fees and costs. The judge removed all charges for "checking the docket" and a cost for meals, thereby reducing the award by $575.65.

[15] In his brief, Pham also appeals the judge's reduction of his initial application for attorney's fees and costs. However, in his supplemental application for attorney's fees and costs, he noted, "Mr. Pham accepts the decision of the Court not to award him legal fees for checking this Court's docket. . . ." This issue is therefore waived and we decline to address it.

incurred rather than the amount the judged deemed reasonable. We conclude that Carter is distinguishable and does not control the attorney's fees request at issue here.

Carter involved a "golden parachute" provision in an executive compensation agreement. Id. at 76, 80. The agreement included a bargained-for provision requiring the bank to pay "any legal expenses incurred" by the plaintiff in enforcing his rights under the agreement. Id. at 80. The Supreme Judicial Court interpreted this golden parachute provision to limit the bank's challenge of attorney's fees to either a claim that the charges "were not incurred in enforcing [the plaintiff's] rights or . . . that the charges were above the highest level of a reasonable fee for those services." Ibid.

As this court has previously explained, Carter represents "an exceptional situation." Citizens Bank of Mass. v. Travers, 69 Mass. App. Ct. 174, 176 (2007). The provision in Carter, requiring the bank to pay "any legal expenses incurred" by the plaintiff, was part of an executive compensation agreement. It was drafted by the bank for the benefit of the plaintiff and inserted to entice the plaintiff to remain employed with the bank "in the face of the uncertain consequences of a possible merger of the employer-bank into another entity." Id. at 176, quoting from Carter, supra at 76. In contrast, in Citizens Bank, the attorney's fees provision requiring the borrower to

pay "all" attorney's fees and costs associated with collection was part of a bank note deemed to be "a contract of adhesion, drawn . . . entirely in the bank's favor." Id. at 177. The Citizens Bank court declined to apply Carter and instead considered it more appropriate to apply the "usual rule" limiting such a borrower's obligation to an amount that is "fair and reasonable." Ibid., quoting from Trustees of Tufts College v. Ramsdell, 28 Mass. App. Ct. 584, 585 (1990) (interpreting note obligating student to repay "all attorneys' fees" as limited to attorney's fees "found to be fair and reasonable"). Here, the attorney's fees provision at issue is part of an affordable housing covenant, drafted by the BRA, in favor of the BRA and its program objectives, and we too consider it appropriate to limit an award of attorney's fees to an amount that is fair and reasonable. See Citizens Bank, supra at 177. It is Citizens Bank and not Carter that governs the attorney's fee request here. Therefore, the judge did not err in limiting Pham's legal fees to "reasonable compensation for all pre-appeal services." The order denying Pham's second supplemental application for attorney's fees and costs is affirmed.[16]

---

[16] As the instant appeal was not frivolous, we decline Pham's request that this court impose double costs on the BRA. Pham is, however, entitled to his appellate attorney's fees and costs. He shall have fourteen days from the date of the rescript to submit to this court an application for appellate attorney's fees and costs, together with supporting

3.  Conclusion.  The judgment is affirmed.  The order denying the BRA's motion to vacate judgment is affirmed.  The order denying Pham's second supplemental application for attorney's fees and costs is affirmed.

So ordered.

---

documentation.  See Fabre v. Walton, 441 Mass. 9, 10-11 (2004).
The BRA shall have fourteen days thereafter to respond.